SOUTHERN VALLEY GRAIN DEALERS
ASSN., a North Dakota Unincorporated
Association, Petitioner [Appellant below]
and Appellant,

v.

BOARD OF COUNTY COMMISSIONERS
OF RICHLAND COUNTY, North Dako-
ta, Respondent [Appellee below] and Ap-
pellee.

Civ. No. 9321.

Supreme Court of North Dakota.

Aug. 18, 1977.

426

Stephen W. Plambeck, of Nilles, Hansen, Selbo, Magill & Davies, Fargo, for petitioner [appellant below] and appellant.

Colin A. Bailey, of Bailey & Lies, Wahpeton, and Christian M. Anderson, State's Atty., Wahpeton, for respondent [appellee below] and appellee.

VOGEL, Justice.

This appeal involves the interpretation and constitutionality of Chapter 40–57.1, North Dakota Century Code, entitled "Tax Exemptions for New Industries." We affirm the judgment of the district court holding the chapter constitutional and upholding an exemption granted under the statute.

Froedtert Malt Division of Farmers Union Grain Terminal Association made an application for exemption from ad valorem taxation on property to be used in the operation of a project to be constructed in Richland County. Since the location was outside any incorporated municipality, the application was made, as required by Section 40–57.1–03, N.D.C.C., to the Board of County Commissioners of Richland County. The project to be constructed consisted of a grain elevator, equipped with complex machinery designed to clean, grade for malting purposes, prepare for malting, and store barley exclusively. The applicant has fur-

ther plans to construct a malting plant in the same general location, but has not yet applied for tax exemption for that plant.

The appellant is an unincorporated association of grain dealers (elevator operators) in approximately the southeastern quarter of this State. Members of the association appeared at meetings of the Richland Board of County Commissioners in opposition to the granting of the tax exemption, and, when the exemption had been granted, appealed, as permitted by Section 11–11–42, N.D.C.C., to the district court of Richland County. That court, as required by Section 11–11–43, N.D.C.C., heard the matter de novo and affirmed the action of the Board of County Commissioners in granting the tax exemption. This appeal followed.

The appeal in this court raises three principal issues.

The first issue is whether the proceedings before the Board of County Commissioners are void and of no effect for want of due process of law. As subsidiary issues under this point, the appellant asserts: (a) that failure to publish a notice to competitors prescribed by Section 40–57.1–03, N.D.C.C., giving notice as to meetings subsequent to the meeting of November 19, 1974, at which the application was considered, violated due process; (b) that even if the statutory notice requirements were satisfied, failure to direct notice to competitors violated due process; (c) that due process was violated because the attorney for Froedtert Malt was also an Assistant State's Attorney and that the consequent conflict of interest vitiated the proceedings; (d) that ex parte communications between the attorney for Froedtert Malt and the Board of County Commissioners violated due process and the open-meetings statutes of this State and vitiated the proceedings; and (e) that the action of the Board of County Commissioners in first granting a five-year tax exemption, then revoking such action and granting a three-year tax exemption, and then revoking such proceedings and granting a five-year tax exemption, violated due process.

The second principal allegation of the appellant is that Froedtert Malt Division of Farmers Union Grain Terminal Association is not entitled to an exemption from ad valorem taxation of property under Chapter 40–57.1, N.D.C.C.

The third principal contention is that Chapter 40–57.1 is unconstitutional.

We will discuss these contentions in the order stated. Before discussing them, a further statement of facts is advisable.

On October 11 and 18, 1974, a notice was published in the Richland County official newspaper by Froedtert Malt advising potential competitors and any other persons interested that a meeting of the Board of County Commissioners would be held on November 19, 1974, at a specified time, to consider the application of Froedtert Malt for tax exemption. Apparently it is conceded that this notice complied with the requirements of Section 40–57.1–03, N.D.C.C., so far as the meeting of November 19, 1974, was concerned.

On November 19, 1974, the Board of County Commissioners met and heard statements from Froedtert Malt and from opponents, including representatives of the appellant. No decision was made on that day, although apparently there was some indication that a decision would be forthcoming promptly. The minutes say only that "No action was taken at this meeting." We are not advised as to what meetings, if any, were held between November 19, 1974, and February 4, 1975.

On February 4, 1975, the Board of County Commissioners met again. This was a regular, or routine, meeting and no specific notice was given under Section 40–57.1.–03. The meeting was recessed until February 5, and on that day the Board of County Commissioners voted to grant to Froedtert Malt a five-year tax exemption. Froedtert Malt then made application to the State Board of Equalization for approval of the five-year tax exemption. On April 18, 1975, the State Board of Equalization returned the application to the County. The letter of transmittal suggested some doubt as to the sufficiency of notice to competitors and in-

dicated concern over a possible court test of validity of the proceedings by which the exemption was granted. The State Board of Equalization also added a requirement that Froedtert Malt buy barley only through commercial outlets and not by direct purchase from farmers.

On April 28, 1975, the Board of County Commissioners had a special meeting, called by the chairman, but without published notice to competitors, and voted to grant a three-year tax exemption with a restriction to the effect that Froedtert Malt would not purchase barley direct from farmers, but would purchase it only from other elevators. The application was then forwarded to the State Board of Equalization, which scheduled a meeting for May 21, 1975, but returned the application to the Board of County Commissioners prior to that date for reasons which do not clearly appear. During the interim there were news stories from which it appeared that Froedtert Malt was reconsidering the building of the project because of the lessened incentive of a three-year tax exemption as compared to a five-year exemption.

On May 27, 1975, the Board of County Commissioners held another hearing, again without the publication referred to in Section 40–57.1–03 (but one notice, not complying with the statute, was published), and notice by mail to all competitors and opponents of the tax exemption who had appeared at previous meetings was given. At the meeting on May 27, the Board of County Commissioners voted to grant a five-year tax exemption to Froedtert Malt.

This exemption was approved on May 29, 1975, by the North Dakota State Board of Equalization, and on June 3, 1975, the Board of County Commissioners took final action granting a five-year ad valorem tax exemption.

I

(a) *Publication of notice of only one meeting:*

It is conceded that the publications of October 11 and 18 gave the notice required

by statute to be given prior to the meeting of November 19, 1974. At that meeting all parties who appeared in response to the statutory notice were heard. No decision was made. Since no decision was made at that meeting, all persons interested should have realized that the decision must necessarily be made at a subsequent meeting open to the public since (1) Section 44–04–19, N.D.C.C., requires all meetings of public bodies to be open to the public; (2) Section 11–11–06, N.D.C.C., provides that all meetings of the Board of County Commissioners shall be open to the public; and Section 11–11–06 also provides:

". . . All matters pertaining to the affairs of the county shall be considered by the board in session only, but it may continue any business from a regular session to a day between regular sessions."

We hold that there was no violation of due process in the granting of a tax exemption at the meeting on February 5, 1975, which meeting was a continuation, pursuant to statute, of a meeting and hearing held on November 19, 1974, statutory notice of which was given. We therefore hold that the five-year tax exemption was approved at the meeting of February 5, 1975. So long as no decision was made, reasonable postponements of consideration of a matter as to which statutory notice has been given do not preclude action on the later date. See *State v. Risty*, 51 S.D. 336, 213 N.W. 952 (1927).

Thereafter, the State Board of Equalization expressed some doubt as to the sufficiency of notice to competitors. This apparently was due to the fact that some elevator operators in Richland County had not received personal notice. However, personal notice is not required by statute. The statute in effect in 1974 (Sec. 40–57.1–03, 1971 Supplement, enacted as Chap. 424, 1971 S.L.) required that the potential project operator

". . . shall publish two notices, the form of which shall be prescribed by the state board of equalization, to competitors of such application for tax exemption in the official newspaper of the municipality at least one week apart. Such publications shall be completed not less than thirty nor more than forty-five days before the governing body of the municipality is to consider such application."[1]

Since this statutory provision had been complied with, the State Board of Equalization could have acted on the application at its meeting of April 18, 1975. Instead of doing so, however, the State Board of Equalization referred the matter back to the County Commissioners, who held another meeting and hearing, on April 28, 1975, without the statutory notice, and purported to grant a three-year exemption. We hold that the Board of County Commissioners, which acquired authority to act through following a specified notice procedure, and having acted by granting the five-year exemption and forwarding the matter to the State Board of Equalization, would have to give a further statutory notice in order to reconsider and take different action than it had already taken, if indeed it had any further power to act at all. See, generally, 20 C.J.S. *Counties* § 93; *Meredith v. Sears*, 427 S.W.2d 813 (Ky.1968).

On May 27, 1975, after reforwarding the matter to the State Board of Equalization and then asking to have it returned, the Board of County Commissioners purported to hold another hearing, again without statutory notice, and purported to grant a five-year tax exemption with the qualification and condition that Froedtert Malt not purchase malting barley direct from producers. We hold that this meeting was held without authority and without statutory notice for the same reasons stated above as to the meeting of April 28, 1975.

On May 29, 1975, the North Dakota State Board of Equalization approved a five-year tax exemption, with the condition stated above, and on June 3, 1975, the Board of County Commissioners ratified and ap-

---

1. The present Section 40–57.1–03 is identical, except that publication must be "completed not less than fifteen nor more than thirty days before the governing body . . . is to consider such application."

proved a five-year ad valorem tax exemption with the condition expressed above.

■ We hold that the action of the Board of County Commissioners at its meetings on November 19, 1974, and February 5, 1975, constituted a statutory approval by the Board of County Commissioners of a five-year tax exemption to Froedtert Malt Division; that the action of the State Board of Equalization on May 29, 1975, approving a five-year exemption with the added condition prohibiting direct purchase from farmers was a valid action by that Board; and that the action of the Board of County Commissioners on June 3, 1975, approving the exemption, with the condition attached, was a valid ratification of the five-year tax exemption.

The meeting of the State Board of Equalization of April 18, 1975, at which that Board took no action in the matter except to return the application to the County for the giving of additional notice, but expressed a desire to give further opportunity to be heard to interested persons, was of no legal significance. The meetings of the Board of County Commissioners of April 28 and May 27, 1975, had no legal status, so far as the Froedtert Malt application was concerned, since no statutory notice was given to interested persons and no binding action was taken at those meetings.

■ We hold that a statutory notice of consideration of a matter at a meeting on a specified date gives jurisdiction to act at that meeting, or at a later regular meeting, or at a meeting continued to a definite time and place within a reasonable time, but that action once taken cannot be reversed or modified without again giving the statutory notice. Interested parties have a right to rely on an action, apparently final, taken after statutory notice is given.

*(b) Direct notice to competitors:*

There is a serious question as to whether any of the members of the petitioner Association are in fact competitors of Froedtert Malt. While all of them buy, clean, and store barley, the evidence indicates that none of them are equipped to handle the fine degrees of grading and preparation of barley for malting purposes of which the Froedtert Malt plant will be capable.

■ But even if we assume them to be competitors, it does not follow that they are entitled to personal notice of the application of Froedtert Malt for tax exemption.

■ In order to provide due process in the matter of notice, a reasonable discretion must be allowed to the Legislature, and there is no requirement that actual notice be received by all interested persons. *Patterson v. City of Bismarck*, 212 N.W.2d 374 (N.D.1973); *Fisher v. City of Minot*, 188 N.W.2d 745 (N.D.1971).

We believe the statute (Sec. 40–57.1–03, N.D.C.C.) requiring notice to competitors by publication provides sufficient notice and meets due-process requirements.

*(c) Conflict of interest:*

The brief of the respondent Board of County Commissioners in this court shows Colin A. Bailey as attorney for the Board of County Commissioners of Richland County and Froedtert Malt. In the district court the same attorney represented the County Commissioners. In the proceedings before the County Commissioners, spread over a period of more than nine months, he acted repeatedly as attorney for Froedtert Malt. During the same period of time, while the Froedtert Malt application was pending before the Board of County Commissioners of Richland County, the same attorney was an Assistant State's Attorney of Richland County. As such, he had the same powers as, and was required to perform any and all duties required of, the State's Attorney. Sec. 11–16–02, N.D.C.C. One of the duties imposed upon the State's Attorney is that he shall "Act as legal advisor of the board of county commissioners, attend the meetings thereof when required, and oppose all claims and actions presented against the county which are unjust or illegal." Sec. 11–16–01, subsec. 12, N.D.C.C. Under Section 11–16–05, N.D.C.C., a State's Attorney must not "Present a claim, account, or other

demand for allowance against the county, except for his own services, nor in any way advocate the relief asked for by the claim or demand of another" [subsec. 1], or "Receive a fee or reward from or on behalf of a prosecutor or other individual for services in any prosecution or business to which it is his official duty to attend" [subsec. 3].

In an attempt to explain away the alleged violation of duty under the statutes quoted, the attorney has represented to this court that he was appointed only to handle juvenile and welfare matters and to act as State's Attorney in the absence of the State's Attorney; that he never gave any advice to the Board of County Commissioners on the Froedtert Malt matter; that both the Board of County Commissioners and Froedtert Malt knew of his dual representation; that State's Attorneys in North Dakota (except in a few of the larger counties, not including Richland County) are permitted to have a private practice; and that it is difficult to hire Assistant State's Attorneys if their private practice is limited. Even if all of this is conceded, still the attorney may have violated his duty under the statutes quoted.

He also may have violated Canon 5, Code of Professional Responsibility, relating to the exercise of independent professional judgment on behalf of a client, and Disciplinary Rules 5–101, 5–102, and 5–105.

Even if we assume, for the purposes of the present case, that he violated his duties, such a violation would not determine the question of what effect, if any, dual representation of two clients with different interests has upon the outcome of litigation in which one or both are involved. In support of its contention that such dual representation vitiates the entire proceeding, the appellant cites three New Jersey cases: *In re A. & B.*, 44 N.J. 331, 209 A.2d 101 (1965); *Schear v. City of Elizabeth*, 41 N.J. 321, 196 A.2d 774 (1964); and *Ahto v. Weaver*, 39 N.J. 418, 189 A.2d 27 (1963). The appellant points out that the New Jersey Supreme Court stated in *Schear, supra*:

"Determination of existence of a conflict of interests in a given situation under our tripartite form of government is within the competence of the judiciary. And when found to exist (even in the absence of the statutory provision cited above), adjudication of the invalidity of the challenged official act would follow. Moreover, where the dual office holding is by a member of the bar whose conduct is subject to the Canons of Ethics and supervision of the Supreme Court, and performance of the duties of one office calls for services as an attorney, possible areas of conflict of interests are subjected to even closer scrutiny and more stringent limitation. As was said by Justice Hall in *Ahto v. Weaver*, 'where the public interest is involved, he may not represent conflicting interests even with the consent of all concerned.' 39 N.J., at 431, 189 A.2d, at p. 34."

However, we note that in *Schear*, the primary question was one of incompatibility of public offices [as was the case in our decision in *Peters v. Bowman Public School District No. 1*, 231 N.W.2d 817 (N.D. 1975)], and that the New Jersey court held that no conflict of duty existed where a city attorney was a member of a planning board. The statement as to "invalidity of the challenged official act" was therefore dictum, and directed only toward violation of a specific statute prohibiting a member of a planning board from acting on any matter in which he had a personal or financial interest. Similarly, in *Ahto v. Weaver, supra*, the question was one of incompatibility of offices, and a divided court held that there was no incompatibility where an assistant county counsel held positions as member of a township council and mayor, but took no action as assistant counsel on matters relating to the municipality. If this case has any applicability to the one before us, it would tend to favor the attorney involved. In its decision in *In re A. & B., supra*, the New Jersey Supreme Court sustained a finding of a county ethics committee that respondents had not violated the canons of professional ethics while acting as both municipal attorneys and attorneys for certain land and building develop-

ers within the same municipality. However, for the future, the court stated that the subject of land development is one in which the likelihood of transactions with a municipality and the room for public misunderstanding are so great that a member of the bar should not represent a developer operating in a municipality in which the member of the bar is the municipal attorney or the holder of any other municipal office of apparent influence. Accordingly, it stated its view, for the future, that dual representation is forbidden even though the attorney has not advised either the municipality or the private client with respect to matters concerning them. The fact of such dual representation itself was held to be contrary to the public interest.

In none of the cases cited was a decision reversed because of a conflict of interest of an attorney.

We find nothing in the record to indicate that any protest was made to the County Commissioners as to the dual representation of the attorney. The first objection we have been able to find in the record came during the appeal de novo to the district court. At that point, the Board of County Commissioners no longer could have substituted legal representatives, at least not without substantial delay and perhaps starting the proceedings anew. As the New Jersey Supreme Court stated in *Schear, supra* :

"In our judgment the public interest demands that such objections be made known to the agencies of government involved at the earliest possible date. In that way opportunity is given, before substantial time and public funds are expended, to consider the existence of any conflict of duty or possible conflict of interests, and whether the dual officeholder should withdraw from the proceedings." 41 N.J. at 324, 196 A.2d at 776.

We further note that there is no direct evidence that the dual representation of the attorney played any part in the decision-making process of the Board of County Commissioners. Both the chairman of the Board of County Commissioners and the attorney denied that the dual representation had any effect. We recognize, of course, that evidence of direct influence would be difficult, if not impossible, to obtain in the ordinary case, and accordingly put slight emphasis on this point.

Our examination of the few cases on the subject, as well as the rather more voluminous literature on conflicts of interest as violations of canons of professional responsibility, leads us to conclude that a violation of canons of professional responsibility or statute as to dual representation does not necessarily compel the reversal of a judgment in proceedings in which the dual representation occurred. In this case, we hold that grounds for reversal have not been shown. This is not to say that more flagrant examples might not result in reversal. Nor do we imply that disciplinary proceedings should or should not be instituted. Institution of such proceedings is primarily in the hands of others, and a determination of a violation of canons can be made only in proceedings commenced for that purpose.

*(d) Ex parte communications between the attorney for Froedtert Malt and the Board of County Commissioners:*

On cross-examination, the attorney was asked whether he had ever had occasion to contact the Board of County Commissioners outside of its meeting with respect to the requested tax exemption, and he replied that he had, "probably a dozen" times. On examination by the State's Attorney, he stated that his contacts were for the purpose of finding out when the Board would act on the application.

Such an inquiry would not violate the open-meetings law. That law requires that meetings be open, but it does not forbid inquiry of one board member as to when the Board will meet or act on any particular matter. In the absence of further proof as to the subject matter of contacts with individual board members other than at open meetings, we are not disposed to hold that due process has been violated by such in-

quiries or that the open-meetings statute has been violated.

*(e) Reconsideration by Board after initial decision:*

As noted above, we agree with the appellant that the Board of County Commissioners had no authority to reduce the tax-exemption period from five years to three years, and then raise it from three years to five years, without complying with statutory requirements as to notice. However, we disagree with the appellant's contention that the original grant of a five-year exemption was not a valid action by the County Commissioners. We find no violation of due process here.

## II

Appellant makes a strenuous argument that neither Froedtert Malt Division nor Farmers Union Grain Terminal Association is a "new industry," as contended in the original application. It points out that G.T.A. is the largest purchaser of barley in North Dakota and purchases approximately one-third of the malting barley in the United States. It further asserts that the storage and cleaning of barley is not a new industry.

However, the statute does not seem to support the argument of the appellant. Section 40–57.1–01, N.D.C.C., containing the declaration and finding of public purpose for the tax-exemption chapter, includes a declaration by the Legislature that the public interest and welfare of North Dakota will be encouraged by the " . . . establishment of additional industrial plants . . . within the state," and requires that political subdivisions and the State Board of Equalization "give due weight to their impact and effect upon existing industry and business [in the granting of tax exemptions] to the end that an unfair advantage shall not be given to new enterprises which is to the substantial detriment of existing enterprises."

Furthermore, as used in the chapter, the word "project" is defined in Section 40–57.1–02, N.D.C.C., to include real property, buildings, and improvements and equipment used or useful in connection with revenue-producing enterprises engaged in:

"1. Assembling, fabricating, manufacturing, mixing, or processing of any agricultural, mineral, or manufactured products, or any combination thereof.

"2. Storing, warehousing, distributing, or selling any products of agriculture, mining or manufacturing."

We find nothing in the statute which requires either that the project operator be a new business entity or that the project be of a variety new to the State of North Dakota. On the contrary, the statute recognizes that the new or additional industrial plant may compete with existing industry, and requires only that the Board of County Commissioners and the Board of Equalization consider the impact of the new industry upon the old so that an unfair advantage shall not be given to the new enterprise which is to the detriment of the older enterprises.

We agree with the district court that the Froedtert Malt plant is of a kind eligible for tax exemption.

## III

The appellant asserts that Chapter 40–57.1, relating to tax exemptions for new industry, is unconstitutional in its entirety for four reasons: (1) that it is an unconstitutional delegation of legislative authority to the Board of County Commissioners and the State Board of Equalization; (2) that it directly assists private entities through the tax system; (3) that it violates the requirement of Section 176, North Dakota Constitution, that taxes be uniform upon the same class of property; and (4) that it violates Section 20, North Dakota Constitution, prohibiting special privileges and immunities.

The otherwise-well-done brief of the appellant is deficient in that it argues these propositions only with general statements and fails to cite any case law, with the sole exception that it cites *Stanley v. Department of Conservation and Develop-*

*ment*, 284 N.C. 15, 199 S.E.2d 641 (N.C. 1973), in support of the second proposition. The attorney for the appellee provides us with even less help—he ignores the constitutional arguments entirely. We will nevertheless discuss the four points raised, but our discussion will be less lengthy and detailed than it might have been if the challenge had been more specific, more solidly based on authority, and more pointedly directed to specific language of the statute. One who attacks a statute on constitutional grounds, defended as that statute is by a strong presumption of constitutionality, should bring up his heavy artillery or forego the attack entirely.

▆ (1) We have said many times that an Act of the Legislature is presumed to be correct and valid, and any doubt as to its constitutionality must, where possible, be resolved in favor of its validity. *Ralston Purina Co. v. Hagemeister*, 188 N.W.2d 405 (N.D. 1971); *Montana-Dakota Utilities Co. v. Johanneson*, 153 N.W.2d 414 (N.D. 1967).

▆ The Legislature is not forbidden to delegate power or authority. It is forbidden only to delegate the entire power to legislate. Even purely legislative powers may be delegated by legislatures to municipalities, which are part of the State government. The boards authorized to grant temporary exemption from taxation in the present case are either a municipal board or a constituent part of the State government itself. As Justice Strutz said, speaking for the court, in *Ralston Purina Co. v. Hagemeister*, *supra*, 188 N.W.2d at 410:

"It is elementary that except in those instances where it is expressly authorized to do so by the Constitution, as, for example, in the case of municipalities, the Legislature may not delegate purely legislative powers to any other board, body, commission, or person. However, although it may not delegate purely legislative power, it has been held that the Legislature may authorize others to do certain things and to exercise certain powers which are not exclusively legislative and which the Legislature itself might do but cannot because of the detailed nature of the things to be done. Just because the Legislature might have exercised such power itself does not necessarily mean that it must be done by that body. As the Minnesota Supreme Court has pointed out:

'* * * Pure legislative power, which can never be delegated, is the authority to make a complete law— complete as to the time it shall take effect and as to whom it shall apply— and to determine the expediency of its enactment. Although discretion to determine when and upon whom a law shall take effect may not be delegated, the legislature may confer upon a board or commission a discretionary power to ascertain, *under and pursuant to the law*, some fact or circumstance upon which the law by its own terms makes, or intends to make, its own action depend.' *Lee v. Delmont*, 228 Minn. 101, 36 N.W.2d 530, at 538 (1949). [Emphasis in original.]

"Thus the power to ascertain certain facts, which will bring the provisions of a law into operation by its own terms, is not a delegation of legislative power. If the law sets forth reasonably clear guidelines which will enable the administrative board to ascertain the facts, so that the law takes effect on such facts under its own provisions and not according to the discretion of the administrative board, the power so delegated is not legislative."

The statute under attack provides that the two boards, in determining whether tax exemptions should be granted,

". . . shall give due weight to their impact and effect upon existing industry and business to the end that an unfair advantage shall not be given to new enterprises which is to the substantial detriment of existing enterprises" [Sec. 40–57.1–01, N.D.C.C.];

that the municipal board shall negotiate with the potential project operator and give notice to competitors; and that the State Board of Equalization may grant partial or complete tax exemption for not longer than five years,

" . . . if it finds that such exemption will not result in unfair tax reduction competition between political subdivisions . . . [and] is in the best interest of the people of North Dakota, . . ." [Sec. 40–57.1–03, N.D.C.C.].

While these statements are general, we believe they are no more so than other authorizations which have been upheld. See Davis, *Administrative Law of the Seventies,* § 2.04.

We must recognize as a practical matter that the Legislature must not violate Section 69 of the North Dakota Constitution, prohibiting special acts, and it cannot take the time to evaluate each application for tax exemption. It has the right to delegate that evaluation to the two boards which deal most often and most directly with taxes on real estate and may be expected to have expertise in the area: the board of county (or city) commissioners in each case and the State Board of Equalization. Delegation to expert boards and bureaus is common, necessary, and desirable in many cases.

We must also recognize, as the Court of Appeals of Kentucky did, in *Commonwealth of Kentucky v. Associated Industries of Kentucky,* 370 S.W.2d 584 (Ky. 1963), that even though there are three branches of government, government cannot be divided into "watertight compartments," and administrative agencies often perform acts which are partly legislative, partly executive, and partly judicial, "only softened by a quasi," as Justice Holmes put it, in his dissent in *Springer v. Government of Philippine Islands,* 277 U.S. 189, 48 S.Ct. 480, 72 L.Ed. 845 (1928).

■ We believe that the challenged delegation of power is well within the power of the Legislature to make, and that the presumption of constitutionality of the statute has not been overcome.

(2) Since neither a North Dakota constitutional provision nor any North Dakota case law is cited in support of the appellant's second claim of unconstitutionality, we hold that the presumption of constitu-

tionality prevails. The North Carolina case cited is of only marginal relevancy to North Dakota constitutional questions.

(3) and (4) Since points (3) and (4) involve the propriety of classification for tax purposes, we will discuss them together.

In *Signal Oil and Gas Co. v. Williams County,* 206 N.W.2d 75 (N.D. 1973), it was held that the Legislature has the right to classify subjects for tax purposes, subject only to the limitation that classification must not be arbitrary; that the State Constitution does not require that tax statutes operate equally and uniformly; that corporations of different characters may be taxed at different rates, or on a different basis, or not at all; that classifications must rest upon some ground of difference having a fair and substantial relation to the objects of the taxation; and that the burden rests upon the one challenging the classification to establish that it has no reasonable relation to a conceivable legislative purpose. It was held that the Fourteenth Amendment of the United States Constitution and Section 176 of the North Dakota Constitution do not require

" . . . the adoption of an iron rule of equal taxation or prevent differences in taxation or discretion in the selection of subjects or reasonable classification of subjects for taxation." 206 N.W.2d at 81–82.

■ Section 20 of the State Constitution, relating to privileges and immunities, is commonly held to be the equivalent of the Federal constitutional provision requiring equal protection of the laws. *Gableman v. Hjelle,* 224 N.W.2d 379 (N.D. 1974); *In re Estate of Jensen,* 162 N.W.2d 861 (N.D. 1968).

The Legislature, in its declaration and finding of public purpose in enacting Chapter 40–57.1, has said that it did so

" . . . to sanction, authorize, and encourage activities in the public interest and for the welfare of the state of North Dakota, its subdivisions and people by assisting in the establishment of additional industrial plants and promotion of economic activities within the state, and

436

thereby increasing production of wealth, and adding to the volume of employment, particularly during those seasons when employment in farming and ranching is slack, thus alleviating unemployment among the people of the state." Sec. 40–57.1–01, N.D.C.C.

The Legislature has chosen to classify certain new projects as worthy of temporary exemption, partial or complete, from taxation. It has stated reasons which appear on their face to be reasonable and to be based upon appropriate legislative policy. We hold that there is no denial of equal protection of the laws, no unconstitutional grant of privileges and immunities to some and not available to others of the same class, that the classification is not arbitrary, that circumstances can reasonably be conceived which sustain it, and that the appellant has not borne the burden of proving the unconstitutionality of the classification. Since there is an appropriate basis for the classification, the rule that taxes be uniform upon the same class of property has not been violated.

We hold that Chapter 40–57.1 is, as against the constitutional challenge made in this case, constitutional.

Affirmed.

ERICKSTAD, C. J., and PEDERSON, PAULSON and SAND, JJ., concur.